**REVISED DECEMBER 19, 2013**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 11-20805

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 18, 2013

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LIA SAMIRA ST. JUNIUS; DEVON MICHEL SPICER; MARTHA RAMOS,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and KING and PRADO, Circuit Judges.

CARL E. STEWART, Chief Judge:

The panel issued the original opinion in this case on December 3, 2013. *United States v. St. Junius*, 735 F.3d 247 (5th Cir. 2013). We GRANT the petition for rehearing, withdraw our previous opinion, and substitute the following.

This is an appeal by Defendants-Appellants Lia Samira St. Junius ("St. Junius"), Devon Michel Spicer ("Spicer"), and Martha Ramos ("Ramos") who were convicted of various crimes related to their involvement in a health care fraud conspiracy. Defendants-Appellants appeal their convictions and

No. 11-20805

sentences. For the reasons provided herein, we AFFIRM St. Junius's convictions and sentences. We also AFFIRM Ramos and Spicer's convictions. Due to a Sentencing Guidelines error conceded by the Government, we VACATE Ramos and Spicer's terms of supervised release and REMAND for re-sentencing.

## FACTUAL BACKGROUND[1]

### A. The Mobility Store

James Reese established Arbor Oaks Medical Equipment, Inc. ("Arbor Oaks"), a durable medical equipment supplier ("DME"), around 2001.[2] The Federal Bureau of Investigation ("FBI") began investigating Arbor Oaks to determine whether the company engaged in health care fraud by billing Medicare for products beneficiaries did not need or receive. Arbor Oaks was subsequently suspended from the Medicare program. Around 2003, Reese established a company called The Mobility Store ("TMS") which also served as a DME provider. Though Reese created TMS, the company was registered as a sole proprietorship under St. Junius's name. Reese is St. Junius's stepfather and has been married to St. Junius's mother since St. Junius was seven years old.

In order to receive Medicare funds, DME suppliers must apply for a Medicare provider number. The National Supplier Clearinghouse ("NSC") processes applications and enrolls approved DME suppliers into the Medicare program. The contents of the application explain the civil and criminal penalties for furnishing false information to gain enrollment into the Medicare program. The application also requires the applicant to provide information concerning

---

[1] This section provides a general factual overview. Supplemental facts are included throughout this opinion when necessary.

[2] Reese had been convicted of several felonies at the time he founded Arbor Oaks. Reese did not list his name as owner when he submitted Arbor Oaks's provider application to Medicare. Instead, Reese listed his wife, Lula Reese, as owner.

2

No. 11-20805

any adverse legal history under the DME's current or former names. An adverse legal history, including criminal convictions or prior suspensions under any Medicare billing number, could result in a DME being excluded from the Medicare program. On May 15, 2004, TMS submitted a Medicare initial enrollment application with St. Junius's signature affixed as owner/operator. Reese had an extensive criminal record and previously operated a company (Arbor Oaks) that was suspended from the Medicare program. These facts made it unlikely that a company bearing Reese's name as owner/operator would successfully obtain a Medicare provider number.

Consequently, Reese asked St. Junius to sign the enrollment application and indicate that she owned TMS. By signing this document, St. Junius certified that she read the contents of the application; that the information therein was true, correct, and complete; and that her signature legally and financially bound TMS to the laws, regulations, and Medicare program instructions applicable to DME suppliers, including the Anti-Kickback Statute.[3] St. Junius certified that she understood the criminal, civil, and administrative penalties for falsifying information in the application. TMS's application indicated that St. Junius was a 5% or greater owner of TMS and a managing employee who had no adverse legal actions imposed against her. No other individuals were reported as having an ownership or managerial role at TMS.[4] Medicare eventually assigned TMS a provider number.[5] Despite St. Junius

---

[3] 42 U.S.C. § 1320a-7b(b)(1)(A) "criminalizes the payment of any funds designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Miles,* 360 F.3d 472, 479 (5th Cir. 2004). Appellants Ramos and Spicer were convicted of violating this statute and it will be hereinafter referred to as the "Anti-Kickback Statute."

[4] Business filings for TMS in Missouri and Texas reflected that St. Junius was the owner of TMS, either individually or as co-owner with Reese.

[5] TMS also became a Medicaid provider after joining the Medicare program. TMS's application to Medicaid contained the same type of information that was included in the

being listed as the owner/operator of TMS, Reese received the majority of TMS's income and managed the company's operations. Essentially, Reese was the true owner and operator of the company.

## B. The Reese Group

Reese also owned and operated a marketing company called The Reese Group ("TRG"). TRG hired marketers to solicit Medicare beneficiaries to order TMS products. TRG and TMS ostensibly operated as the same entity, sharing employees and the same office space in Houston, Texas. Reese was TRG's director and Brenda Lopez ("Lopez") was its office manager.

## C. St. Junius

According to former TMS officer manager Brenda Lopez, St. Junius knew that Reese's name was not included in the documentation provided to Medicare. At trial, Lopez testified that during the course of her employment, she witnessed St. Junius sign letters, checks, and other documents as the owner of TMS. Lopez never signed St. Junius's name on any document, nor did she witness any other TMS or TRG employee do so. Lopez further testified that TMS, through St. Junius, falsely represented to Medicare that its Houston address was used solely as a warehouse, when in fact it was TMS's primary office.

Between May 2005 and October 2007, a NSC representative conducted site inspections of TMS and had frequent correspondence with St. Junius regarding TMS's violations of the "21 Medicare Supplier Standards." As a result of TMS's continuous failure to comply with Medicare standards, NSC revoked TMS's supplier number in October 2007.

---

Medicare application. St. Junius signed TMS's Medicaid application in the presence of a notary. In doing so, she certified that she was the only person with an ownership interest in TMS, and that no one with an ownership interest had been convicted of a crime or terminated from the Medicare or Medicaid programs.

No. 11-20805

**D.  Ramos and Spicer**

Ramos and Spicer recruited Medicare patients for TRG.  They signed independent contractor agreements stating that in exchange for their "marketing services," TRG would pay them a 10% commission on the price of items purchased for patients they referred.[6]

While Ramos was an independent contractor for TRG, she also worked full-time as a "community liaison" for The Four Group Home Care ("Four Group").  Four Group provides home care services to Medicare patients.  Ramos supplied TRG with patient information she obtained during the course of her duties as a community liaison for Four Group.  TRG often made cash payments to Ramos for 10% of the amount Medicare paid for items ordered on behalf of patients she recruited.  She also received checks drawn on TMS's account that were signed by either St. Junius or Reese.

At the time Spicer recruited Medicare patients for TRG, he was affiliated with Elite Care Medical Clinic ("Elite Care").  Elite Care is a comprehensive health care provider.  Spicer supplied TRG with patient information obtained from Elite Care and TRG paid him commissions from Medicare payments on claims TMS submitted on these patients' behalf.  At trial, a Government investigator testified that approximately 408 of Elite Care's patients corresponded to claims billed by TMS.  Medicare and TMS records reflect that in 2005, Medicare paid TMS over $710,000.00 on claims for patients referred by Spicer.  Spicer received $71,081.00 in commissions in 2005.

---

[6] Commissions are the payments prohibited by the Anti-Kickback statute and may be referred to at times as "kickbacks."  There is no distinction, for the purpose of this opinion, between a commission and a kickback.

No. 11-20805

**E.  Criminal Investigation**

In 2007, authorities executed a search warrant at the Houston TMS/TRG office and seized 89 boxes of records.[7]  Among these records, agents found blank prescription forms; blank prescription pads; completed prescription order forms without a physician's certification or signature; and numerous data sheets indicating that TMS submitted claims to Medicare without a prescription order. An investigator testified at trial that she obtained Medicare's records of TMS's claims and compared them with a random selection of 100 TMS patient files. For sixty-three of the patients, the investigator did not find proof of delivery of the item(s) billed to Medicare.  Many of TMS's files contained prescription forms that were unsigned by a doctor, diagnosis codes that did not match what was billed to Medicare, and items that were billed but did not match anything TMS had purchased from a DME manufacturer.  A large number of the products TMS purchased had either no approved Healthcare Common Procedures Coding System ("HCPCS") code or a different code than what TMS billed to Medicare.[8] Additionally, TMS routinely billed for a product that had a higher price than the product that TMS actually purchased.  TMS also billed Medicare for products patients did not request, need, or receive.

Between 2005 and 2008, TMS billed Medicare for $19,481,164.00.  During the same period, Medicare paid TMS $5,182,499.84 for products TMS did not purchase and Medicaid paid TMS $8,931,248.00 on related claims.

---

[7]  The agents involved in executing the search warrant were from the United States Department of Health and Human Serves, FBI and Texas Attorney General's Office.

[8]  The HCPCS provides the description and code for items or services that are billed to Medicare and Medicaid.

No. 11-20805

## PROCEDURAL HISTORY

On February 10, 2011, a federal grand jury returned a 47-count superseding indictment charging Defendants-Appellants, and others,[9] with health care fraud conspiracy in violation of 18 U.S.C. § 371 (count 1). The superseding indictment also charged St. Junius with committing health care fraud in violation of 18 U.S.C. § 1347 (counts 2–16) and money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (count 33), and it charged Ramos and Spicer with receiving kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) (Ramos: counts 17, 19–22; Spicer: counts 18, 23–24).

A jury trial began on April 11, 2011 and concluded on April 27, 2011. The jury returned its verdict on April 29, 2011, finding St. Junius guilty of health care fraud conspiracy (count 1), health care fraud (counts 10–16) and money laundering conspiracy (count 33). St. Junius was acquitted on counts 2–9 (health care fraud). The district court sentenced St. Junius to a term of 135 months' imprisonment (60 months on count 1, 120 months on counts 10–16, and 135 months on count 33, to run concurrently). St. Junius was also sentenced to three years of supervised released, a $900 special assessment, and ordered to pay $8,651,805.76 restitution.

Ramos and Spicer were convicted of all Anti-Kickback charges and acquitted of the conspiracy to commit health care fraud charge. The district court sentenced Ramos to five concurrent terms of 60 months' imprisonment followed by concurrent three year terms of supervised release. The court also

---

[9] James Reese, Brenda Lopez, and Lily Johnson were also charged in the superseding indictment with committing health care fraud and conspiracy to commit health care fraud. Johnson worked for TMS as a medical equipment supplier and for TRG as a marketer/recruiter. Reese and Lopez were also charged with money laundering and violating the Anti-Kickback Statute. Reese was also charged with money laundering concealment and tax evasion. Prior to trial, Lopez and Johnson pleaded guilty to health care fraud conspiracy and Reese pleaded guilty to health care fraud and tax evasion. Lopez and Johnson testified on behalf of the Government and Reese testified as a defense witness.

No. 11-20805

ordered Ramos to pay $53,987.04 restitution, imposed a $4,691.00 fine, and a $500.00 special assessment. The district court sentenced Spicer to three concurrent terms of 60 months' imprisonment followed by concurrent three year terms of supervised release. The court also ordered Spicer to pay $794,434.08 restitution, imposed a $71,121.00 fine, and a $300.00 special assessment.

## DISCUSSION

Defendants-Appellants challenge their convictions and sentences on multiple fronts. We address each party's claims in turn.

### A. St. Junius

#### 1. Rebuttal Witness' Testimony

At trial, St. Junius called co-defendant Reese as a defense witness. On direct examination, Reese testified that he helped St. Junius open TMS with plans that she would own the store and eventually run it. After St. Junius's counsel concluded his examination, counsel for defendant Ramos questioned Reese. Counsel for Ramos asked Reese about his discussions with Medicare regarding whether it was proper to pay marketers commissions for Medicare patient referrals. Reese stated that Medicare told him paying commissions was "okay," and he conveyed the same information to his marketers. Reese provided the same response when Spicer's attorney questioned him about Medicare's instructions on commissions.

On cross-examination, the Government asked Reese whether anyone from Medicare visited him while he was operating Arbor Oaks. Reese answered: "I've never talked to Medicare about Arbor Oaks." The prosecutor asked Reese to clarify his statement and Reese reiterated that he could not recall speaking to Medicare when he was operating Arbor Oaks. Reese also denied telling any of his Arbor Oaks employees that he met with Medicare. Also on cross-examination, the prosecutor asked Reese whether St. Junius helped out at Arbor

8

Oaks from time to time.  Reese stated that he did not think so but could not recall for sure.

At the conclusion of Reese's testimony, the defense rested.  The Government called a rebuttal witness, Lucean Kuykendall, for the purpose of impeaching Reese based upon his testimony about his conversations with Medicare during his time at Arbor Oaks, and about whether St. Junius ever visited Arbor Oaks.  Kuykendall began her testimony by stating that she worked for Arbor Oaks in 2002 or 2003.  At the mention of Arbor Oaks, St. Junius's attorney immediately objected to Kuykendall's testimony on the basis of relevancy.  The government responded that the defense called Reese and elicited information about Arbor Oaks. The court overruled the objection.  Kuykendall then testified to three key points of fact: 1) While Kuykendall worked for Arbor Oaks, Reese told her that he met with a Medicare official; 2) after meeting with the Medicare official, Reese told Kuykendall that Arbor Oaks could no longer pay marketers commissions for referring Medicare patients; and 3) although St. Junius did not work for Arbor Oaks, she visited Arbor Oaks on occasion.

At trial, St. Junius objected to Kuykendall's testimony on the grounds that: 1) whether St. Junius visited Arbor Oaks was irrelevant; and 2)  Reese's conversations about a meeting with Medicare constituted inadmissible hearsay.  The district court overruled the objections.  We review the district court's ruling on those grounds for abuse of discretion, subject to a harmless error analysis. *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or clearly erroneous assessment of the evidence." *Id.* (citation omitted).

### a. **Relevance**

St. Junius argues that Kuykendall's testimony that St. Junius visited Arbor Oaks is irrelevant to the crimes charged.  This issue is easily resolved. Before Kuykendall testified, Lily Johnson provided the same information,

without objection, during the Government's case-in-chief.  Even if we concluded that Kuykendall's testimony was irrelevant, which we do not, any error that accrued as a result of its admission is harmless.  *See United States v. Griffin*, 324 F.3d 330, 348 (5th Cir. 2003) (error is harmless where objectionable testimony is cumulative of other testimony that has not been challenged).

### b.  Hearsay

St. Junius argues that Kuykendall's testimony about Reese's statements after his meeting with a Medicare official was inadmissible hearsay.  Under Federal Rule of Evidence 801(c), hearsay is a statement, other than one made by the declarant while testifying at trial or a hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  The rule against hearsay does not apply when an out-of-court statement is offered for some purpose other than to prove the truth of the matter asserted.  *See United States v. Watkins*, 591 F.3d 780, 786 (5th Cir. 2009).  "Using an out-of-court utterance as circumstantial evidence of the declarant's knowledge of the existence of some fact, rather than as testimonial evidence of the truth of the matter asserted, does not offend the hearsay rule."  *Id.* (citation omitted).  Evidence of a witness' prior inconsistent statements may be admitted to impeach that witness.  *United States v. Sisto*, 534 F.2d 616, 622 (5th Cir. 1976).  "[T]he making of the previous statement may be drawn out during cross-examination of the witness himself, or if on cross-examination the witness has denied making the statement, or has failed to remember it, the making of the statement may be proved by another witness."  *Id.* (citation omitted).

During his trial testimony, Reese denied meeting with a Medicare official about Arbor Oaks.  He also denied discussing the propriety of paying commissions for Medicare patient referrals during the meeting.  As a Government rebuttal witness, Kuykendall testified that when she worked for Arbor Oaks, Reese told her that he met with a Medicare official.  He also told her

that Arbor Oaks would have to cease paying commissions to marketers. Additionally, Kuykendall testified that St. Junius visited Arbor Oaks. The evidence offered during Kuykendall's rebuttal testimony directly contradicts Reese's testimony. This evidence was offered, not for the truth of the matter asserted, but rather to impeach Reese's credibility.[10] Accordingly, the district court did not abuse its discretion by admitting this evidence.

### c. Character Evidence

St. Junius argues for the first time on appeal that Kuykendall's rebuttal testimony—that St. Junius visited Arbor Oaks—was improper character evidence that should have been excluded pursuant to Fed. R. Evid. 404(b)("404(b)"). St. Junius posits that this evidence was inadmissible because it suggested that she associated with Reese in a separate, uncharged crime. She also argues for the first time that the district court committed error by not issuing a limiting instruction, sua sponte, as to Kuykendall's testimony.

Because St. Junius failed to object on these grounds at trial, we review these claims for plain error. *See United States v. Waldrip*, 981 F.2d 799, 805 (5th Cir. 1993); *see also* Fed. R. Evid. 103(a)(1). Plain error is an error "so obvious that failure to notice it would seriously affect fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice." *Waldrip*, 981 F.2d at 805.

Character evidence is inadmissible to show that a person acted in accordance with that character on a particular occasion. *See* Fed. R. Evid. 404(a)(1). However, in a criminal case, evidence of other acts is admissible to prove knowledge. Fed. R. Evid. 404(b)(2). The Fifth Circuit applies a two-prong test to resolve 404(b) issues: (1) the other crimes, wrongs, or acts must be

---

[10] At the conclusion of the trial, the district judge issued verbal and written jury instructions that included a limiting instruction on impeachment by prior inconsistencies.

relevant to an issue other than the defendant's character; and (2) the evidence's probative value must not be substantially outweighed by its prejudicial effect. *See United States v. Beechum*, 582 F.2d. 898, 911 (5th Cir. 1978) (en banc). "In weighing the probative value and unfair prejudice, this court must make a 'commonsense assessment of all the circumstances surrounding the extrinsic offense.'" *United States v. Cockrell,* 587 F.3d 674, 678 (5th Cir. 2009) *(*quoting *Beechum*, 582 F.2d at 914).

During Kuykendall's testimony, she stated that St. Junius did not work at Arbor Oaks, but sometimes visited the office. Kuykendall did not provide any information about what St. Junius did during her visits and her testimony does not readily suggest that St. Junius engaged in other crimes, wrongs, or acts with respect to Arbor Oaks. She did not testify that St. Junius reviewed documents, wrote checks, made phone calls or was otherwise involved in Arbor Oaks's operations. The evidence presented at trial did nothing more than suggest that St. Junius, at some point, had occasion to visit her stepfather's place of business. That being the case, we believe it imprecise to categorize this aspect of Kuykendall's testimony as 404(b) evidence.

Nevertheless, even if we assume that the Government elicited the testimony as 404(b) evidence, which would be odd on rebuttal, the admission of Kuykendall's testimony did not result in a "miscarriage of justice" as prescribed by our plain error standard. Here, evidence that St. Junius visited Arbor Oaks could have been properly admitted to show that St. Junius had *knowledge* of Reese's pernicious history of committing health care fraud, and not that she was involved in it. St. Junius's supposed knowledge of the fraud at Arbor Oaks would have enlightened her as to Reese's desire to utilize her name and unblemished past for the purposes of establishing TMS as a DME recognized under the Medicare program. *See United States v. Madrid*, 510 F.2d 554, 555–56

(5th Cir. 1975) ("Admission of such evidence is a matter within the broad discretion of the trial court and is proper, where, as here, it is introduced not to show a propensity to commit crime but to show knowledge.") (citation omitted). Because 404(b) evidence can be admitted to show knowledge, admission of evidence showing that St. Junius visited Arbor Oaks would not offend rule 404's prohibition against improper character evidence. We also conclude that no unfair prejudice resulted from the admission of this evidence.

St. Junius also alleges that the district court committed error by not issuing a limiting instruction, sua sponte, as to Kuykendall's testimony. Again, we do not conclude that Kuykendall's testimony necessarily suggested that St. Junius committed a prior bad act. For that reason, we need not reach the question of whether it was error to not provide a limiting instruction sua sponte. Were we to reach this issue, however, it is unlikely that we would find St. Junius's argument meritorious. *See United States v. Parziale*, 947 F.2d 123, 129 (5th Cir. 1991) (failure to give a limiting instruction in this context is generally held not to be plain error).

### 2. Deliberate Ignorance Instruction

On appeal, St. Junius challenges the district court's decision to provide the jury with a deliberate ignorance instruction.

At trial, St. Junius's defense centered on the notion that Reese was the mastermind behind the health care fraud conspiracy and that St. Junius was nothing more than an unsuspecting pawn in his scheme.[11] At the close of the trial, the Government requested a "deliberate ignorance" instruction to

---

[11] St. Junius's counsel argued at closing that "for [St. Junius] to be guilty of this fraud, she has to know about it. She didn't know about it. Like, if one of you worked for Enron when there's a big fraud and you don't know about it, you're doing clerical work, you're not guilty of the fraud."

supplement the "knowingly" section of the jury charge.  The court then issued the following instruction on deliberate ignorance:

> The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.  You may find that defendant, Lia St. Junius, had knowledge of a fact if you find that this defendant deliberately closed her eyes to what would otherwise have been obvious to her. While knowledge on the part of this defendant cannot be established merely by demonstrating that this defendant was negligent, careless, or foolish, knowledge can be inferred if this defendant deliberately blinded herself to the existence of a fact.[12]

St. Junius challenges the deliberate ignorance instruction on multiple fronts.  First, she reasserts the objection she made at trial that the instruction improperly altered the "knowing and intentional" standard.  St. Junius preserved this issue for review under an abuse of discretion standard.[13]  *See United States v. Vasquez,* 677 F.3d 685, 692 (5th Cir. 2012) (When a defendant timely objects to a jury instruction, we review the district court's decision for abuse of discretion.).

Secondly, she argues that because the instruction was limited to her, the district court "exacerbated the detrimental effect" by "singling out" St. Junius. St. Junius's written objection to the deliberate ignorance instruction did not include any argument against the instruction being applied only to her. Therefore, this issue was not properly preserved for appeal and will be reviewed for plain error.  *See Vasquez,* 677 F.3d at 692 (stating that a party must inform

---

[12] This instruction followed the Fifth Circuit's pattern jury instructions.  *See Fifth Circuit Pattern Jury Instructions: Criminal* § 1.37 (2001).

[13] At trial, St. Junius's filed a written objection that stated that "[t]he incorporation of the 'Willfull Blindness' instruction into the 'Knowingly' instruction reduces the Government's burden of proving beyond a reasonable doubt that the Defendant intentionally and knowingly engaged in a scheme to defraud a health care benefits program."

14

the court of the specific objection and the grounds for the objection to preserve the issue for review under the abuse of discretion and harmless error standard).

### a.  Deliberate Ignorance Instruction Generally

"Appellate review of a deliberate ignorance instruction is necessarily a fact-intensive endeavor.  To determine the validity of the instruction, this Court must carefully examine the totality of the evidence."  *United States v. Lara–Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990).  "Even if the district court errs in its decision to give the deliberate ignorance instruction, any such error is harmless where substantial evidence of actual knowledge is presented at trial." *United States v. Miller*, 588 F.3d 897, 906 (5th Cir. 2009) (alteration, citation and internal quotation marks omitted).  The deliberate ignorance instruction should be given when a "defendant claims a lack of guilty knowledge and the proof at trial supports a reasonable inference of deliberate ignorance."  *United States v. Scott*, 159 F.3d 916, 922 (5th Cir. 1998) (citation omitted).  Submission of a deliberate ignorance "instruction is proper where the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct."  *United States v. Jones*, 664 F.3d 966, 979 (5th Cir. 2011) (citation omitted).  In reviewing whether the evidence warranted the submission of the deliberate ignorance instruction, we view the evidence in the light most favorable to the Government. *Id.*

St. Junius's defense at trial focused substantially on her alleged lack of guilty knowledge.  St. Junius elicited facts to support her argument that Reese was the mastermind behind the health care fraud conspiracy and St. Junius had no idea that TMS, TRG, and Reese were involved in illegal conduct.  The Government presented evidence that St. Junius was a willing participant in the health care fraud conspiracy.  Though Reese was the leader of the organization,

Case: 11-20805    Document: 00512476762    Page: 16    Date Filed: 12/19/2013

No. 11-20805

those who worked closely with him testified that they knew that his conduct was improper. Co-defendants Lopez and Johnson testified that although they did not familiarize themselves with Medicare regulations, they knew that certain practices the companies engaged in were wrongful. For example, they knew that billing without a prescription, billing for one product but providing another, resubmitting the same claim with a different date of service, or failing to reimburse Medicare for items that were not received by beneficiaries were all improper practices. Lopez and Johnson testified that St. Junius handled billing for TMS and was involved in other operational aspects of the business. St. Junius also received substantial financial benefits for her role as owner of TMS.[14]

The second part of this analysis requires a finding that the defendant engaged in purposeful contrivance to avoid learning of the illegal conduct. The evidence presented at trial demonstrated that the atmosphere at TMS was rife with signals of illegality. Given that St. Junius worked in the same space and under the same conditions as Lopez and Johnson, it is reasonable to infer that she was aware of TMS's improper and illegal practices.[15] As a result, we conclude that St. Junius was subjectively aware of a "high probability of illegal conduct." Inasmuch as St. Junius denies knowledge of the illegalities, the overwhelming deficiencies in TMS's operations could only go unnoticed by

---

[14] TMS defrauded Medicare/Medicaid of over $8.6 million. The funds were deposited into accounts bearing various names and used to purchase a variety of expensive vehicles and a house. The accounts were controlled and operated by Reese and St. Junius.

[15] Although the instruction is proper where there is "subjective awareness" of illegal conduct, we believe the evidence in this case supports a finding that St. Junius had *actual* knowledge that her conduct was unlawful. Where there is substantial evidence of actual knowledge, the inclusion of a deliberate ignorance instruction is harmless. *Jones*, 664 F.3d at 979.

16

someone who purposely avoided them. This type of conduct suggests "purposeful contrivance to avoid learning of the illegal conduct." *See id.*

As stated previously, a deliberate ignorance instruction is appropriate when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate ignorance. In this case, St. Junius claimed at trial, and continues to claim today, that she was unaware of any wrongdoing that occurred at TMS. Despite her awareness of Medicare's allegations that TMS was in violation of numerous Medicare regulations, St. Junius continued in her role as the signatory of numerous documents that misrepresented facts and helped to defraud the Government. There is no evidence before us that St. Junius paused to question why Reese's name could not be included in any Medicare related documents, why billing codes did not match what TMS ordered for its patients, or why TMS provided Medicare with volumes of patently false information. The deliberate ignorance instruction is designed to "inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *See Jones*, 664 F.3d at 979 (citation omitted). Viewing the evidence in the light most favorable to the Government, we conclude that the district court did not abuse its discretion by issuing a deliberate ignorance instruction under these facts.

### b. "Singling Out" St. Junius

We also perceive no error in the district court's decision to instruct the jury that the deliberate ignorance instruction applied only to St. Junius and not her co-defendants. "[I]n a multiple-defendant case where only some of the defendants justify a deliberate ignorance charge, singling out the defendant who merits the instruction, based, perhaps, on disputed or equivocal evidence, may be unfairly prejudicial to that defendant." *United States v. Bieganowski*, 313 F.3d 264, 290 (5th Cir. 2002) (citation and internal quotation marks omitted).

"It is equally true, however, that giving the instruction generally, without naming a specific defendant, may prejudice those co-defendants who do not merit the instruction." *Id.* (citation and internal quotation marks omitted). "Thus, we have indicated that the better approach in this situation is to give the instruction and indicate that it may not apply to all of the defendants." *Id.* (alteration, citation, and internal quotation marks omitted).

*Bieganowski* is instructive on the quandary district courts face when deciding whether to issue a deliberate ignorance instruction generally, or whether to issue the instruction with respect to a single defendant. In *Bieganowski,* four defendants were charged with various crimes arising out of a scheme to defraud medical insurance companies. *Id.* at 269. At trial, the district court issued a deliberate ignorance instruction specific to defendant Bieganowski. *Id.* at 290. On appeal, Bieganowski alleged that the instruction prejudiced him by unfairly singling him out from his co-defendants. *Id.* We rejected Bieganowski's complaints as to the instruction and noted that this type of decision was one "generally within the discretion of the trial court." *Id.* We noted that "judgments of this kind are primarily entrusted in the trial judge who inevitably has a superior feel for the dynamics of the trial and the likely reaction of the jury." *Id.* (citation and emphasis omitted).

St. Junius offers no persuasive argument as to why we should not defer to the wisdom of the district court who, having observed the entirety of the trial, decided that this instruction was appropriate. Therefore, we hold that the district court's issuance of the deliberate ignorance instruction only as to St. Junius, and not her co-defendants, did not amount to plain error.

### 3. District Court's Pens

St. Junius challenges comments made by the district court judge about his use of different color pens during trial. St. Junius's trial counsel did not make

a contemporaneous objection to the judge's comments.  During the trial, the district court judge addressed the jury after a recess and stated the following:

> Please be seated. I'm going to write down what I find humorous, and we'll talk about it at the end of the trial. Okay?
>
> By the way, I keep track of all sorts of things that go on, including when you're out of the room, so you'll understand as to what goes on maybe with some of these bench conferences or if you have to stay in there a little bit longer. So, I take complete notes. Like this one point, I find it amusing; but I write it down. I'll visit with you after the case in the jury room. That's what the red pen is for.
>
> Counsel, that's for the good stuff. The other stuff is in black.

At the conclusion of the evidence, the judge provided the following instruction to the jury:

> [D]o not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.  Except for the instruction to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

Because there was no objection to the district court's comments, the plain error standard of review applies.  *United States v. Sanchez*, 325 F.3d 600, 603 (5th Cir. 2003).

"To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." *United States v. Achobe*, 560 F.3d 259, 272 (5th Cir. 2008) (citation omitted).  While a federal trial judge may manage the pace of a trial, comment on evidence, and even question witnesses, the judge may not give an appearance of partiality.  *See United States v. Hefferon*, 314 F.3d 211, 221 (5th Cir. 2002). Nonetheless, the trial court judge is not required to remain silent and passive

during a criminal prosecution. *See United States v. Davis*, 752 F.2d 963, 975 (5th Cir. 1985).

St. Junius urges this court to reverse her convictions because the trial judge explained that he uses red ink to write down things he finds humorous and black ink to make other notes. According to St. Junius, the jury could "look to the Judge to see what color pen he was using" to determine how they should interpret the evidence. St. Junius does not direct our attention to any particular moment during the trial when the judge switched pens or caused a certain juror to be distracted because he did so. St. Junius cites cases as examples of inappropriate conduct by trial judges to support her position.[16]  In this case, the trial judge's discussion of the pens he uses is a far cry from the conduct of the judges in the cases St. Junius relies upon. In viewing the totality of the judge's conduct, his fairly innocuous and brief commentary about his pens, during the course of a lengthy trial, does not amount to plain error.

### 4. St. Junius's Challenges to her Sentence

The district court applied a three-level increase to St. Junius's base offense level on the grounds that she held a managerial role in the offense under United States Sentencing Guideline ("U.S.S.G.") § 3B1.1(b) and a two-level increase for abuse of position of trust under U.S.S.G. § 3B1.3. On appeal, St. Junius argues that both sentencing enhancements were applied in error.[17]

---

[16] In *United States v. Bray*, 546 F.2d 851 (10th Cir. 1976), the trial judge set a defendant's bail in front of the jury. In *United States v. Lanham*, 416 F.2d 1140 (5th Cir. 1969), the trial judge asked a testifying defendant 119 probing questions subsequent to direct and cross examination. In *United States v. Haywood*, 411 F.2d 555 (5th Cir. 1969), the trial judge, in the presence of the jury, twice informed the defendant of his "right to allocution" before the case was submitted to the jury for its decision.

[17] The district court adopted the findings in the presentence report ("PSR"). In describing St. Junius's relevant conduct, the PSR reported that St. Junius worked in concert with Reese to acquire the necessary business licenses for TMS to operate. St. Junius represented in the provider application to Medicare that she was the sole owner and operator of TMS to avoid disclosing Reese's involvement. St. Junius's name on the Medicare application

No. 11-20805

The district court's application of the United States Sentencing Guidelines ("U.S.S.G") is reviewed de novo. *United States v. Lige*, 635 F.3d 668, 670 (5th Cir. 2011). We accept the findings of fact made in connection with sentencing unless they are clearly erroneous. *Id.* We affirm the district court's application of the managerial role enhancement if it is plausible in light of the record read as a whole. *See United States v. Nava*, 624 F.3d 226, 229 (5th Cir. 2010). We reverse "only if, based on the entire evidence, [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006) (citation omitted).

### a. Managerial Role Enhancement

The U.S.S.G. provide for a three-level increase to a defendant's base-offense level "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive. . . ." U.S.S.G. § 3B1.1(b). This enhancement may be appropriate where "a defendant did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1(b) cmt. n.2; *United States v. Delgado*, 672 F.3d 320, 345 (5th Cir. 2012).

Evidence presented at trial by both the Government and defense made clear that the true leader of the criminal enterprise was James Reese. The evidence at trial also demonstrated that St. Junius played a significant role in the functioning of that enterprise and that she profited more from it than any

---

established the means by which TMS submitted fraudulent medical claims.

The PSR further reported that St. Junius made significant decisions affecting TMS's operations. St. Junius supervised marketers and employees for TMS and TRG. When co-defendant Brenda Lopez was unavailable, St. Junius was the go-to person who paid the marketers, ordered products, and supervised the billing. Eleven business accounts relating to TMS were opened in St. Junius's name as owner of TMS and she was authorized to use over forty debit cards opened under the accounts.

participant other than Reese. The sentencing enhancement at issue is not limited to the "true leader" of the criminal enterprise. It also applies to individuals who "exercised management responsibility over the property, assets, or activities of a criminal organization." *Id.* St. Junius knowingly and willingly led others to believe that she was the owner of TMS. She signed Medicare documents, signed and issued paychecks, and sent correspondence as the owner of TMS.

Our charge here is to determine whether it was *plausible*, in light of the record, that St. Junius's conduct warranted a role enhancement. *See Nava*, 624 F.3d at 229. With that in mind, we are satisfied that it is plausible, in light of the record, that St. Junius exercised some level of management responsibility over the property, assets, or activities of TMS. Therefore, we affirm the district court's application of the managerial role enhancement.

### b. Abuse of Trust Enhancement

St. Junius also argues on appeal that the district court's application of an abuse of trust enhancement was erroneous.

Section 3B1.3 provides a two-level enhancement for defendants who have "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The commentary to U.S.S.G. § 3B1.3 explains that a position of trust is characterized by professional or managerial discretion and that individuals who occupy these positions are typically under less supervision than individuals whose responsibilities are primarily non-discretionary in nature. *See* U.S.S.G. § 3B1.3 cmt. n.1; *United States v. Miller*, 607 F.3d 144, 148 (5th Cir. 2010). The sentencing court should conduct a two-step inquiry when considering whether to apply U.S.S.G. § 3B1.3. *See United States v. Ollison*, 555 F.3d 152, 166 (5th Cir. 2009). "First, the court must determine whether the defendant occupied a

position of trust at all. If not, the inquiry ends and no enhancement accrues. If, however, this initial inquiry produces an affirmative response, the court must proceed to ascertain the extent to which the defendant used that position to facilitate or conceal the offense." *Id.* at 165 (citation omitted).

We hold that as the listed owner of TMS, St. Junius occupied a position of trust, which satisfies the first prong of this analysis. Her position and authority as owner of a licensed DME provider, "involved the type of complex, situation-specific decisionmaking that is given considerable deference precisely because it cannot be dictated entirely by, or monitored against, established protocol." *Miller*, 607 F.3d at 150 (5th Cir. 2010) (citations omitted). By issuing St. Junius a license to provide durable medical equipment, Medicare entrusted her to render a necessary service to some of the most vulnerable members of her community. Moreover, Medicare authorized St. Junius to render those services with an attendant expectation that she would submit accurate information in seeking reimbursement from the Medicare program. *See id.* (noting that the functioning of government insurance programs relies heavily upon "the honesty and forthrightness of the DME provider in its claim submissions").

Having decided that St. Junius occupied a position of trust, we must now determine whether she used her position in a manner that significantly facilitated the commission of the health care fraud offenses at issue. We are satisfied that she did. St. Junius signed important documents as owner of TMS, issued pay checks to employees and contractors, and engaged in numerous other activities that helped facilitate this health care fraud conspiracy. Without St. Junius, it would have been extraordinarily difficult, if not impossible, for TMS to accomplish its criminal pursuits. Given those considerations, we affirm the district court's application of the abuse of trust sentencing enhancement.

No. 11-20805

## B. Ramos

### 1. Sufficiency of the Evidence

Ramos challenges her convictions under the Anti-Kickback Statute solely on the basis that the Government did not present sufficient evidence to prove that she "willfully" violated the statute.[18]

A procedurally preserved challenge to the sufficiency of evidence is reviewed de novo. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). When reviewing the sufficiency of the evidence, we view all evidence "in the light most favorable to the Government, with all reasonable inferences and credibility choices made in support of the jury's verdict. The evidence is sufficient to support a conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009) (per curiam) (citation omitted).

Ramos argues on appeal that she could not have willfully violated the Anti-Kickback Statute because she did not know that engaging in a commission-based pay arrangement with a Medicare provider was a violation of the law. Ramos contends that a conviction under the Anti-Kickback Statute requires proof beyond a reasonable doubt that she knew that being paid on commission was illegal. We disagree.

The Anti-Kickback Statute prohibits receiving commissions in return for referring a Medicare patient to a Medicare provider. 42 U.S.C.

---

[18] To sustain a conviction under the Anti-Kickback Statute, the Government must prove the following elements beyond a reasonable doubt: (1) the defendant solicited or received any remuneration, including any kickback or bribe, directly or indirectly, overtly or covertly, in cash or in kind, to any person; (2) that the remuneration was solicited or received to induce such person to refer an individual to a person for furnishing or arranging of an item or service; (3) that the item or service was one for which payment may be made in whole or in part under a federal healthcare program; and (4) that the defendant acted knowingly and willfully. *See* 42 U.S.C. § 1320a-7b(b)(1)(A). Ramos concedes that the Government satisfied its burden of proof with respect to elements 1–3. Ramos's challenge is limited strictly to the assertion that the Government failed to prove that she acted willfully.

§ 1320a-7b(b)(1)(A); *see United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004) (The Anti-Kickback Statute "criminalizes the payment of any funds designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program."). Section 1320a-7b(h) defines willfulness as it pertains to the Anti-Kickback Statute. In doing so, Section 1320a-7b(h) clarifies that the Government is not required to prove actual knowledge of the Anti-Kickback Statute or specific intent to violate it. Instead, the Government must prove that the defendant willfully committed an act that violated the Anti-Kickback Statute. As applied to Ramos, the Government was only required to prove that she willfully solicited or received money for referring Medicare patients to TRG.[19] Ramos concedes that the Government proved as much.

Furthermore, the Government produced evidence that Ramos had actual knowledge of the Anti-Kickback Statute and its prohibitions even though such proof was not required. The Government showed that as part of Ramos's employment with Four Group, she signed documents that explained that receiving commission payments in this context was illegal. By signing these documents, Ramos affirmed that she understood that such conduct was a

---

[19] Ramos argues that we should adopt the definition of willfulness applied by the Ninth Circuit in *United States v. Dearing*, 504 F.3d 897 (9th Cir. 2007). *Dearing* holds that the willfulness component of 18 U.S.C. § 1347 (which is not the Anti-Kickback Statute, but rather, a general health care fraud statute) requires that the government prove that the defendant acted with knowledge that her conduct was unlawful. *Id.* at 901. *Dearing*, however, was decided prior to a statutory amendment that clarified Congress' intent with respect to the willfulness element of § 1347. Section 1347 was amended in 2010 as was 42 U.S.C. § 1320a-7b, the Anti-Kickback Statute. The § 1347 amendment adds language that mirrors the 2010 amendment to the Anti-Kickback Statute found in § 1320a-7b(h). Section 1320a-7b(h) made clear that the government need not prove that the defendant had "actual knowledge of the statute or a specific intent to violate the statute." In light of the amendment, *Dearing* is unpersuasive on this issue.

violation of law.[20] This evidence, though unnecessary to sustain a conviction, would satisfy the willfulness element even under Ramos's erroneous construction of the Anti-Kickback Statute.

For the aforementioned reasons, we hold that a rational trier of fact could have found that the Government proved the willfulness element of the Anti-Kickback Statute beyond a reasonable doubt.

## 2. Prosecutor's Statement on the Law

Ramos alleges that the prosecutor misstated the law during his rebuttal argument. Counsel for Ramos argued in closing that the Government failed to prove that Ramos knew that receiving commission payments was illegal under the Anti-Kickback Statute. The prosecutor stated in rebuttal that the Government did not have to prove that Ramos knew that receiving commission payments was illegal. Rather, the prosecutor argued, the Government need only prove that Ramos knowingly received commission payments. Ramos's trial counsel did not object to the prosecutor's remarks. When no contemporaneous objection is raised during a prosecutor's closing remarks, the propriety of those remarks is reviewed for plain error. *United States v. Perez-Solis*, 709 F.3d 453, 466–67 (5th Cir. 2013).

Ramos's challenge regarding the prosecutor's comments parrots the substance of her challenge to the district court's willfulness instruction. She claims that the willfulness element of the Anti-Kickback Statute requires that the Government prove that she knew that receiving commissions for referring patients was illegal. Again, Ramos's construction of the Anti-Kickback Statute is erroneous. The prosecutor correctly explained that the Government need only

---

[20] "Proof that a document has been signed is sufficient to charge a signatory with its contents." *United States v. Whittington*, 783 F.2d 1210, 1215 (5th Cir. 1986)(citing 7 J. Wigmore, *Evidence* § 2134, at 719 n.2 (Chadbourn rev. 1979)).

prove that Ramos knowingly and willfully received commissions in exchange for referrals.  We perceive no error here, plain or otherwise.

### 3.  Ramos's Four Group Personnel File

Ramos challenges the admission of her Four Group personnel file as a violation of the district court's order requiring the parties to exchange all trial exhibits seven days prior to the start of trial.  On the first day of trial, the Government called Bernadine Njoku, the director of nursing at Four Group.  During her testimony, Njuko produced Ramos's personnel file which included a copy of Four Group's Policies and Procedures.  Ramos's counsel objected on the grounds that he had not seen the records before and had insufficient time to review them.  The court overruled the objection and admitted the documents.  Ramos's counsel did not request a continuance or a recess to examine the personnel file.

The file included documents entitled "Prohibition of Solicitation of Patients," and "Confidentiality Statement/HIPPA Privacy Guideline."  The policy prohibiting solicitation of patients cited the Anti-Kickback Statute and explained that receiving commission payments for referring Medicare patients is unlawful.  The documents bore Ramos's signature which acknowledged that she read and understood the information contained therein.

 We review the district court's enforcement of its own scheduling orders for abuse of discretion.  *United States v. Hale*, 685 F.3d 522, 532 (5th Cir. 2012), *cert. denied*, — U.S. —, 133 S. Ct. 559 (2012).

On appeal, Ramos originally challenged the admission of the personnel file as a discovery violation pursuant to Fed. R. Crim. P. 16(a)(1)(E) ("Rule 16").  The Government argued in its brief that Ramos's challenge under Rule 16 failed because Ramos did not submit a discovery motion requesting the evidence, as required by Rule 16.  In her reply brief, Ramos conceded that she did not make

an appropriate discovery request.  Now, in the alternative, Ramos argues that the district court abused its discretion by violating its own order that the parties exchange all trial exhibits seven days prior to the start of trial.  Ramos claims that the personnel file became the "lynchpin" of the Government's case against her.  According to Ramos, "[t]he personnel file was crucial to the Government's case because it was the only evidence that Ramos had knowledge of Medicare and HIPPA regulations."

Even if we found that admitting the personnel file was an abuse of discretion, which we do not, admission of the file did not prejudice Ramos's substantial rights.  *See United States v. Doucette*, 979 F.2d 1042, 1044–45 (5th Cir. 1992) (an alleged discovery error should result in a new trial only when a defendant demonstrates prejudice to her substantial rights).  The personnel file was admitted to show that Ramos was familiar with the Anti-Kickback Statute.  Contrary to Ramos's assertion, the personnel file was not the "lynchpin" of the Government's case because the Government was not required to prove that Ramos had actual knowledge of or a specific intent to violate the Anti-Kickback Statute.  The Government would have sustained its burden of proof without the admission of the personnel file.  We also note that the personnel file was equally available to Ramos before trial because Ramos had access to, and likely had a copy of, her own personnel file.  Ramos cites no authority supporting her argument that reversal is required under these circumstances.  Accordingly, we defer to the wisdom of the district court and hold that it did not abuse its discretion by admitting Ramos's personnel file.

### 4.  Abuse of Trust Enhancement

Ramos argues that the two-level abuse of trust enhancement should not apply to her because she did not have a fiduciary relationship with Medicare. and because "mere access" to Medicare billing information is not sufficient to

support a finding that she occupied a position of trust. With respect to the abuse of trust enhancement, Ramos's arguments on appeal differ from her objections at sentencing. We review these newly raised claims for plain error.[21] *United States v. McElwee*, 646 F.3d 328, 338 (5th Cir. 2011).

U.S.S.G. § 3B1.3 Application Note 2(B) explains that § 3B1.3 captures the conduct of any individual who uses his or her position to obtain, transfer or unlawfully use any "means of identification" to facilitate the commission of an offense.[22] "Means of identification," includes any name, social security number, date of birth, and a number of other identifiers. U.S.S.G. § 3B.1.3 cmt. n.2(B)(ii). By way of example, the commentary to § 3B1.3 provides that "a hospital orderly who exceeds or abuses his or her position by obtaining or misusing patient identification information from a patient chart" is subject to the application of an abuse of trust enhancement. *Id.*

Ramos cites *Ollison* in support of her argument that she did not occupy a position of trust. 555 F.3d at 152. In *Ollison*, the district court applied the abuse of trust enhancement to a Texas school district secretary who used the school district's credit card to make unauthorized purchases. *Id.* at 155–56. Ollison was convicted of theft from an organization receiving federal funds and sentenced to a term of imprisonment. *Id.* at 155. She challenged her sentence on several grounds, one of which was the misapplication of the abuse of trust enhancement. In reversing the district court, we emphasized the fact that

---

[21] At sentencing, Ramos only challenged the application of the abuse of trust enhancement on the basis that she did not hold a "position superior to other members" of TRG.

[22] "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993); *see also United States v. Lipscomb*, 619 F.3d 474, 477 (5th Cir. 2010) (quoting *Stinson*'s holding that commentary to the guidelines is "treated as an agency's interpretation of its own legislative rule.")

No. 11-20805

Ollison's duties as secretary were clerical in nature and did not grant her the "substantial discretionary judgment" that generally accompanies a position of trust. *Id.* Additionally, we found that her position was not "instrumental in accomplishing the fraud." *Id.* at 169.

Our decision in *Ollison* is inapposite to the case *sub judice* because defendant Ollison's conduct did not implicate the circumstances described in the § 3B1.3 Application Note 2(B). Here, the commentary to § 3B1.1 speaks directly to Ramos's conduct in that she obtained and transferred patients' "means of identification" to TRG by using her position as a community liaison for Four Group. In doing so, she abused a position of trust. Accordingly, the district court committed no error in its application of this sentencing enhancement.

## C.  Spicer

### 1.  Abuse of Trust Enhancement

Spicer also challenges the district court's application of the abuse of trust enhancement to his sentence. Spicer's challenge to the enhancement is similar to Ramos's challenge *supra.* Like Ramos, Spicer fails to articulate why his conduct falls outside of the scope of § 3B1.3 Application Note 2(B). The Government proved at trial that Spicer transferred patients' "means of identification" from Elite Care to TRG. Therefore, we conclude that his conduct falls squarely within the ambit of this sentencing guidelines enhancement.[23]

---

[23] Subsequent to the submission of his reply brief, Spicer provided this Court with supplemental authorities pursuant to Fed. R. App. P. 28 (j). Spicer requested that we consider the Supreme Court's recent decision in *Alleyne v. Unites States*, 133 S. Ct. 2151 (2013) and apply its reasoning to the abuse of trust enhancement. *Alleyne* held that any fact that increases the mandatory minimum sentence for a crime is an element of the crime that must be submitted to the jury. *Id.* at 2153. Spicer asks that we extend *Alleyne*'s reasoning to cases where a defendant's sentence is enhanced by elements that were not included in the charging document and not proven at trial beyond a reasonable doubt. *Alleyne* specifically addressed mandatory minimum sentences. The abuse of trust enhancement does not give rise to a mandatory minimum sentence. We therefore decline to extend *Alleyne*'s holding to the abuse of trust enhancement.

### 2. Loss Calculation

Spicer challenges his sentence on the grounds that it is based upon an improper loss calculation. "We review de novo the district court's method of determining loss, while clear error review applies to the background factual findings that determine whether or not a particular method is appropriate." *United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011) (citation omitted).

"The amount of loss resulting from the fraud is a specific offense characteristic that increases the base offense level under U.S.S.G. § 2B1.1(b)(1)(I)." *Id.* Loss is defined as "the greater of actual or intended loss." *Id.* Section 2B1.1(b)(1)(I) provides for a 16-level increase if the loss was between $1,000,000 and $2,500,000. U.S.S.G. § 2B1.1(b)(1)(I). In determining intended loss in the health care fraud context, we have stated that "the amount fraudulently billed to Medicare/Medicaid is prima facie evidence of the amount of loss the defendant intended to cause." *Isiwele* 635 F.3d at 203 (alteration, citation and internal quotation marks omitted).

Spicer's PSR indicates that TMS billed Medicare/Medicaid $1,560,249.05 based upon claims for patients Spicer referred to the company. The district court adopted the PSR's finding that the intended loss in Spicer's case amounted to $1,560,249.05. Spicer asserts that he should only be accountable for the amount actually paid on those claims as opposed to the amount billed. We disagree. Applying the standard we articulated in *Isiwele*, the amount fraudulently billed to Medicare in this case was prima facie evidence of Spicer's intended loss. Spicer, as permitted by the case law, could have provided additional evidence to show that the amount billed overstated his intent. Rather, Spicer provided no evidence to this end. Therefore, we hold that the district court's loss calculation was not erroneous.

### 3. Restitution Calculation

Spicer challenges the district court's restitution order on the grounds that it was improperly based on conduct outside of the offenses for which Spicer was convicted. Ramos adopts this argument by reference.

At sentencing, the Government requested that the district court impose the payment of restitution as a term of Spicer's supervised release. The district court agreed and imposed restitution in the amount of $794.434.08. The restitution amount was derived from a calculation of the total amount Medicare/Medicaid paid TMS based on Spicer's referrals; a figure that grossly exceeded the amount Medicare/Medicaid paid with respect to the crimes for which Spicer was convicted. Because Spicer failed to object to the restitution order in this case, we review this claim for plain error. *See United States v. Howard,* 220 F.3d 645, 657 (5th Cir. 2000).

"The general rule is that a district court can award restitution to victims of the offense, but the restitution award can encompass only those losses that resulted directly from the offense for which the defendant was convicted." *United States v. Maturin* 488 F.3d 657, 660–61 (5th Cir. 2007) (citing *Hughey v. United States*, 495 U.S. 411, 413 (1990)). Here, the Government concedes that the district court's restitution orders exceed the losses derived from the conduct for which Spicer and Ramos were convicted. Accordingly, we VACATE the restitution orders with respect to Spicer and Ramos and REMAND for re-sentencing. If the district court imposes restitution, it should be limited to the losses suffered as a result of the crimes for which Spicer and Ramos were convicted.

### CONCLUSION

For the foregoing reasons, we wholly AFFIRM St. Junius's convictions and sentence. Due to a Sentencing Guidelines error conceded by the Government,

No. 11-20805

we VACATE Ramos and Spicer's terms of supervised release and REMAND for re-sentencing. We otherwise AFFIRM Ramos and Spicer's convictions and sentences.